661 So.2d 1052 (1995)
Robert J. GUIDRY
v.
BANK OF LaPLACE, Patrick Guidry, A B C Insurance Company, First National Bank of Commerce.
No. 94-CA-1758.
Court of Appeal of Louisiana, Fourth Circuit.
September 15, 1995.
*1053 Arthur A. Lemann, III, Arthur A. Lemann, IV, New Orleans, for Plaintiff/Appellant.
B. Franklin Martin, III, Stephen W. Rider, McGlinchey Stafford Lang, New Orleans, and Joseph Accardo, Jr., Richard L. Edrington, Accardo, Edrington & Golden, LaPlace, for Defendants/Appellants (Bank of LaPlace and Patrick Guidry).
R. Patrick Vance, Thomas K. Potter, III, Rosemarie Falcone, Timothy S. Cragin, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, for Defendant/Appellant (First National Bank of Commerce).
Mary E. Arceneaux, Louisiana Bankers Association, Baton Rouge, and John J. Gill, Michael F. Crotty, Irving D. Warden, American Bankers Association, Washington, DC, for (Amici CuriaeLouisiana Bankers Association & American Bankers Association).
*1054 Before KLEES, LOBRANO and LANDRIEU, JJ.
LANDRIEU, Judge.
This case arises from a Ponzi[1] pyramid scheme operated by Lynn Paul Martin[2] under the guise of a travel business, LPM Enterprises (LPM).[3] Beginning in 1982, Martin convinced his victims to provide him with funds to purchase large blocks of airline tickets for groups taking gambling trips to Las Vegas. Martin told his victims that certain Las Vegas hotels would reimburse him for the tickets and pay him a commission. In return for a check, Martin gave each victim two post-dated checks representing the victims original investment and what amounted to a 60% annual return on the investment. The airline tickets and arrangements were fictitious, however, and Martin kept his scheme alive by obtaining funds from later victims to honor the checks given to earlier victims. Over a twenty month period beginning in August 1986, Robert Guidry (Guidry), the plaintiff in this case, engaged in approximately 331 transactions with Martin representing a total of more than $170,000,000 advanced by Guidry to Martin. Martin's scheme collapsed in April 1988 and Guidry was left holding worthless checks from Martin for over $12,000,000, approximately $7,000,000 of which was reinvested returns on earlier Guidry checks to Martin, leaving Guidry with a net loss of approximately $5,500,000.
Guidry filed suit against the Bank of LaPlace, where Martin kept the LPM bank account through which he administered the Ponzi scheme, and against Patrick Guidry, one of the bank's directors. Guidry also sued the First National Bank of Commerce (FNBC) where he maintained an account during a portion of the twenty months that he was investing with Martin. Additionally, in response to FNBC's exception of failure to join an indispensable party, Guidry amended his petition to name Martin as a defendant.
In April 1994, the jury found that the Bank of LaPlace and Patrick Guidry aided and abetted Martin and that FNBC breached its fiduciary duty to Guidry by failing to investigate and disclose to him that the Martin "deal" might be a fraud. The jury determined that Guidry sustained damages totalling $4,540,000 and apportioned those damages between Martin (60%), the Bank of LaPlace and Patrick Guidry (15%), FNBC (15%), and Guidry (10%).
Guidry concedes, however, that the trial court erred in finding liability on the part of the Patrick Guidry. Accordingly, the judgment against Patrick Guidry is reversed and the action against him is dismissed.[4] The central issue on appeal for the two remaining defendants, FNBC and the Bank of LaPlace, is whether the banks owed Guidry a duty to protect him from financial losses arising out of his investments in the Ponzi scheme.

DISCUSSION
Although Guidry was never a customer of the Bank of LaPlace and became a customer of FNBC only after his initial investments in Martin's scheme, the jury nevertheless found that both FNBC and the Bank of LaPlace had a "special relationship of trust and confidence" with Guidry. Based on this "special relationship," FNBC was found liable to Guidry for failing to investigate, discover, and disclose the fraudulent nature of Martin's scheme and the Bank of LaPlace was found liable for making a "misrepresentation of fact" upon which Guidry placed "justifiable reliance" in participating in Martin's scheme. In addition, although finding that there was *1055 no conspiracy between the defendants, the jury found that BOL and Patrick Guidry aided and abetted Martin in defrauding Guidry.
In challenging the verdict, FNBC and the Bank of LaPlace raise numerous assignments of error pertaining to the jury charges and interrogatories.[5] A trial judge has a duty to give instructions which properly reflect the law applicable in light of the facts of the particular case. Barnett v. New Orleans Public Service, Inc., 489 So.2d 452, 454-55 (La. 4th Cir.1986) (citation omitted). In order to fulfill that duty, he must both require that the jury consider only the correct law and avoid confusing the jury. Kennedy v. St. Charles General Hosp. Auxiliary, 630 So.2d 888, 895 (La. 4th Cir.1993), writ denied, 634 So.2d 863 (La.1994) (citation omitted). Likewise, jury interrogatories must fairly and reasonably point out the issues to guide the jury in reaching an appropriate verdict. If the verdict form does not adequately set forth the issues to be decided by the jury (i.e., omits an applicable essential legal principal or is misleading and confusing), such interrogatories may constitute reversible error. Two major errors appear in the jury instructions and interrogatories in this case.

La.Rev.Stat. 6:1124
First, the trial court refused to instruct the jury on La.Rev.Stat.Ann. 6:1124 (West Supp.1995).[6] That statute provides:
No financial institution or officer or employee thereof shall be deemed or implied to be acting as a fiduciary, or have a fiduciary obligation or responsibility to its customers or to third parties other than shareholders of the institution, unless there is a written agency or trust agreement under which the financial institution specifically agrees to act and perform in the capacity of a fiduciary. The fiduciary responsibility and liability of a financial institution shall be limited solely to the performance under such a contract and shall not extend beyond the scope thereof. Any claim for breach of fiduciary responsibility of a financial institution or any officer or employee thereof may only be asserted within one year of the first occurrence thereof. This Section is not limited to credit agreements and shall apply to all types of relationships to which a financial institution may be a party.
The Legislature intended the Act to be deemed "clarifying in nature" and applicable "to prior and now existing relationships and transaction involving financial institutions."[7] Moreover, there are no vested or contractual rights between Guidry and the banks which would be disturbed by application of the statute.[8] Thus, the statute was clearly applicable and the trial judge erred in failing to instruct the jury accordingly.
The omission of any reference to La.Rev.Stat. 6:1124 was exacerbated by the trial judge's instructions to the jury which were, as a whole, confusing and misleading. See Brown v. White, 405 So.2d 555, 558 (La. App. 4 Cir.1981), jdgmt aff'd, 430 So.2d 16 (La.1982) (the adequacy of jury instructions must be determined in the light of jury instructions as a whole). Even accepting arguendo that La.Rev.Stat. 6:1124 (and its requirement of a written agency or trust agreement[9] *1056 to impose fiduciary responsibilities for customers or third parties on a bank) was inapplicable, the jury instructions do not adequately reflect the relevant law.
Prior to the enactment of La.Rev. Stat. 6:1124, an independent duty of care was not imposed on the bank in the absence of special circumstances (such as the bank's role as a pledgee) creating a fiduciary relationship. See Trans-Global Alloy, 583 So.2d at 452. In this case, the jury was instructed generally on La.Civ.Code art. 2315 which provides that "every act whatsoever of man that causes damage to another obliges him by whose fault it happened, to repair it." La.Civ.Code Ann. art. 2315 (West 1979). Although that article was utilized prior to the 1991 enactment of La.Rev.Stat. 6:1124 by Louisiana courts to "impose tort liability against banks that have violated clear fiduciary duties to their customers," Scott v. Bank of Coushatta, 512 So.2d 356, 364 (La. 1987) (emphasis added), it was not clear from the instructions that, in order to find the banks liable under Article 2315, the jury must first find that the banks owed a fiduciary duty to Guidry. Rather than being given explicit instructions on fiduciary duty in the context of Article 2315, the jury was generally instructed on "proximate cause" and told that Guidry had only to establish three elements to prove his case against the banks: (1) "the kind of fault which the law calls negligence"; (2) that the losses or injuries suffered "were in fact caused by the Defendants' conduct"; and (3) that there were actual damages. The jury was specifically instructed to resolve these questions as follows:
If Plaintiff probably would have suffered those losses in his participation with LPM Enterprises regardless of what the Defendants did, then you must conclude that the losses were not caused by them and render a verdict for the Defendants.
If on the other hand Plaintiff probably would [sic] have suffered the claimed losses in the absence of Defendants' conduct, then you must conclude that their conduct did play a part in Plaintiff's losses and you should proceed to the next element.
The only instruction as to fiduciary duty was given within the context of the negligent representation charge. The jury was instructed:
A fiduciary duty is a duty to act in the best interest of another person whose business the fiduciary conducts. To find that there was a fiduciary duty on the part of Bank of LaPlace, Patrick Guidry and FNBC or First NBC to supply correct information to Robert Guidry about the LPM and Lynn Paul Martin deal, Plaintiff must show that the special relationship of trust or confidence existed between him and the Defendants; that the relationship obligated the Defense [sic] to act as a fiduciary and the scope of that duty obligated them to investigate the Martin and LPM scam on behalf of Plaintiff; and that the Defendants knew or should have known that the Martin and LPM deal was a scam and they failed to tell or disclose to Plaintiff the Martin and LPM deal was a scam in breach of that duty.
After being given scant guidance as to what circumstances create a fiduciary relationship, the jury was instructed that the standard of care applicable to the banks was that of "a reasonable person exercising ordinary care and prudence." The judge reiterated this standard of care several times, instructing the jury as follows:
In this case, the basic standard applicable is a requirement that Defendants exercise that degree of care which we might expressly expect from an ordinarily prudent person under the same or similar circumstances.
* * * * * *
In summary, in order to find the Defendants' conduct substandard, you must find that as an ordinarily prudent person under all circumstances surrounding their conduct, that they should have reasonable [sic] foresee[n] that as a result of their conduct, some such loss as the Plaintiff suffered would occur and you must find also that they failed to exercise reasonable care to *1057 avoid the loss. Simply "How would an ordinarily prudent person have acted if faced with similar conditions or circumstances?"
In addition, the judge failed to distinguish between FNBC and the Bank of LaPlace and their respective connections to Guidry or to instruct the jury on justifiable reliance or material misrepresentation. By wording the charge as he did, the trial judge unwittingly suggested to the jury that an individual's subjective trust or confidence in a bank could alone impose such a duty. This is evidenced by the corresponding jury interrogatories:
Negligence
12. Do you find by a preponderance of the evidence that there was a special relationship of trust and confidence between BOL and Pat Guidry and Robert Guidry with respect to the Lynn Paul Martin deal?
 Yes X No ____
13. Do you find by a preponderance of the evidence that BOL and Pat Guidry breached that duty by making a misrepresentation of fact to Robert Guidry?
 Yes X No ____
14. Do you find by a preponderance of the evidence that Robert Guidry was damaged as a result of his justifiable reliance upon the misrepresentation?
 Yes X No ____
15. Do you find by a preponderance of the evidence that there was a special relationship of trust or confidence between FNBC and Robert Guidry with respect to the Lynn Paul Martin deal?
 Yes X No ____
16. Do you find by a preponderance of the evidence that the relationship obligated FNBC to act as a fiduciary to Robert Guidry with respect to the Lynn Paul Martin deal?
 Yes X No ____
17. Do you find by a preponderance of the evidence that FNBC breached its fiduciary duty to Robert Guidry by failing to investigate and disclose to him that the Lynn Paul Martin deal might be a fraud?
 Yes X No ____

Aiding and Abetting
In the absence of a conspiracy, there is no distinct cause of action for aiding and abetting under Louisiana law. In this case, however, the jury was instructed that such an independent cause of action did exist. The jury was charged as follows:
Robert Guidry further contends the Bank of LaPlace, Patrick Guidry and FNBC aided and abetted Martin and LPM Enterprises in his fraudulent check kiting and Ponsi [sic] schemes. To prove his claim for aiding and abetting, Plaintiff must prove each of the following essential elements by a preponderance of the evidence: First, the existence of a fraudulent scheme by Martin and LPM Enterprises; Secondly, Bank of LaPlace, Patrick Guidry and First NBC were generally aware of Martin and LPM's fraudulent scheme; and Third, Bank of LaPlace, Patrick Guidry and First NBC knowingly rendered substantial assistance to Martin and LPM in the perpetration of this fraudulent scheme.
The corresponding portion of the special verdict form allowed the jury to find as follows:
Conspiracy
2. Did the Banks of LaPlace and/or Pat Guidry conspire with Lynn Paul Martin to defraud Robert Guidry?
 Yes ___ No X 
4. Did FNBC conspire with Lynn Paul Martin or Bank of LaPlace and Pat Guidry to defraud Robert Guidry?
 Yes ___ No X 
Aiding and Abetting
6. Do you find by a preponderance of the evidence that Bank of LaPlace and Pat Guidry were aware of the fraud by Martin?
 Yes X No ___

*1058 7. Do you find by a preponderance of the evidence that Bank of LaPlace and Pat Guidry rendered substantial assistance to Lynn Paul Martin d/b/a LPM Enterprises in perpetuating the fraud against Robert Guidry?
 Yes X No ___
8. Did the Bank of LaPlace and Pat Guidry cause damage to Robert Guidry as a result of their aiding and abetting activities? (emphasis added)
 Yes X No ___
Thus, although finding no conspiracy, the jury found the Bank of LaPlace liable for aiding and abetting Martin.
The record makes clear that the trial court[10] relied upon Woodward v. Metro Bank of Dallas, 522 F.2d 84, 94-97 (5th Cir.1975) as interpreted by FDIC v. First Interstate Bank of Des Moines, N.A., 885 F.2d 423, 429 (8th Cir.1989) in charging the jury on this issue. Those cases pertain to the aiding and abetting of a violation of the federal securities laws which is a federal cause of action requiring (1) conduct specifically proscribed by federal securities law (not merely a "fraudulent scheme") and (2) the purchase or sale of "securities."[11]See Securities Exchange Act of 1934, § 10(b). Because Guidry's claim was not based on a violation of federal securities law, the instructions were inappropriate.
For the foregoing reasons, we find that the jury instructions and interrogatories were tainted with legal errors and prejudiced the defendants. Accordingly, we set aside the findings of the jury and undertake a de novo review of the record. Rosell v. ESCO, 549 So.2d 840 (La.1989); Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975).

De Novo Review
Guidry's claim against the banks is based on four contentions. We review each of them individually.
First, Guidry argues that FNBC and the Bank of LaPlace conspired with Martin. However, there is no evidence of the requisite agreement between the banks or between either of them and Martin necessary to find a conspiracy. See State v. Kihnel, 488 So.2d 1238, 1240 (La. 4th Cir.1986).
Second, Guidry contends that FNBC and Bank of LaPlace aided and abetted Martin. Prior to amendment in 1987, La.Civ.Code art. 2324 provided that "[h]e who causes another person to do an unlawful act or assists or encourages in the commission of it, is answerable in solido, with that person for the damage caused by such act." The words "assists" and "encourages" as used in the article contemplated acts performed pursuant to a conspiracy which cause injury or damage. Miller v. Keating, 339 So.2d 40, 43 (La. 3rd Cir.1976), amended on other grounds and aff'd, 349 So.2d 265 (La.1977); Buras v. Machella, 172 La. 580, 134 So. 751 (La.1931); Rush v. Town of Farmerville, 156 La. 857, 101 So. 243 (La.1924). See also Tabb v. Norred, 277 So.2d 223 (La. 3rd Cir.), writ denied, 279 So.2d 694 (La.1973). The 1987 amendment rephrased it in terms of conspiracy, conformable with the jurisprudence. National Union Fire Ins. Co. v. Spillars, 552 So.2d 627, 634 (La. 2nd Cir. 1989), writ denied, 556 So.2d 61 (La.1990). Accordingly, liability cannot be imposed under Louisiana law for aiding and abetting in the absence of a conspiracy.
Third, Guidry contends that the Bank of LaPlace was negligent in failing to discover and prevent Martin's schemes. He argues that the bank should have realized from the high volume of overdrafts in Martin's account, as well as the profit the bank made *1059 from those overdrafts, that Martin was involved in a fraudulent scheme. This claim against the Bank of LaPlace is based on two short telephone conversations (initiated by Guidry) with Patrick Guidry concerning Martin's Bank of LaPlace account. In September 1986, Patrick Guidry allegedly assured Guidry that Martin was a long-standing customer with a medium-to-high-six-figure account. In August 1987, Patrick Guidry once again allegedly assured Guidry that there was nothing wrong with Martin's account.
To be held liable for failure to disclose information, "there must exist a duty to speak or disclose information." Greene v. Gulf Coast Bank, 593 So.2d 630, 632 (La. 1992) (citation omitted). The Bank of LaPlace was clearly under no duty to disclose information about its customer (Martin) to a non-customer (Guidry). See La.Rev.Stat. Ann. 6:332 (West 1986); see also La.Rev. Stat.Ann. 9:3571 (West 1991). Moreover, banks handle a high volume of transactions and cannot be required to supervise the checking account activity of their customers, see Shreveport Production Credit Association v. Bank of Commerce, 405 So.2d 842, 845-46 (La.1981), nor should they be potentially liable for the fraudulent activities of their customers.
Finally, Guidry argues that FNBC breached its special and fiduciary duty to him by failing to investigate, discover, and disclose Martin's schemes. He contends a remark allegedly made by one of FNBC's lending officers in December 1987 (after Guidry had loaned to or invested large sums of money with Martin in return for post-dated checks) that Martin's scheme might be a "bankable deal" impelled him to accelerate his investments into Martin's scheme. Guidry testified that he was fearful that he would lose his 60% annual return if the bank began funding Martin and he "went bezerk [sic] with [his] numbers" and doubled his net participation in the scheme from $2.2 million to $5.4 million in four months. Research does not reveal, nor does logic suggest, any circumstances wherein a duty arises for a bank to independently investigate investments made by an experienced and sophisticated businessman. See Greene, 593 So.2d at 632-33. Guidry's association with FNBC started only after his initial participation in Martin's scheme when, upon the advice of his longtime investment advisor, he began meeting with FNBC officers to discuss transferring the business of Harvey Gulf International Marine, Inc., (owned by Guidry and his brother) to FNBC. Guidry never met with FNBC investment officers or indicated in any manner that he relied upon the bank for investment advice or that he was a vulnerable or susceptible investor in need of protection. In fact, by his own admission, Guidry responded to a Hibernia bank officer's discomfort with the LPM deal by switching to a FNBC account to facilitate his LPM investments and had his own entourage of people to advise and investigate his prospective investments, including the LPM deal. Clearly, under these circumstances, FNBC had no duty to protect Guidry from his own folly.
For the foregoing reasons, we find no fault on the part of the appellants and find that Martin, as an intentional tortfeasor, is 100% responsible for the damages sustained by Guidry. Therefore, the judgment against FNBC, the Bank of LaPlace, and Patrick Guidry is reversed. Because Martin did not appeal the judgment, the issue of damages is not before us. Accordingly, the judgment against Martin and the award of damages in the amount of $4,540,000 is affirmed.
REVERSED IN PART; AFFIRMED IN PART.
NOTES
[1] The term "Ponzi scheme" used to describe a scheme in which a swindler uses money from later victims to pay earlier victims is derived from the last name of the swindler in Cunningham v. Brown, 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924).
[2] As a result of the scheme, Martin pleaded guilty to federal criminal charges and is serving a fifteen-year prison sentence.
[3] LPM Enterprises, an unincorporated sole proprietorship, was merely an alter ego for Martin himself.
[4] See Henning Const. v. First Eastern Bank, 92-0435 (La.App. 4 Cir. 3/15/94) 635 So.2d 273, 276, writ denied, 95-1544 (La. 9/30/94) 642 So.2d 870 (where there is no evidence from which a trier of fact could reasonably infer that a corporate director breached a personal duty to a third party, an action seeking to impose personal liability on the director must be dismissed).
[5] In addition to those discussed, the defendant banks raise as assignments of error the judge's refusal to give jury charges on unclean hands, prescription, tax benefits defense, intervening cause, materiality of alleged misrepresentations, and justifiable reliance. Because we reverse the findings of the jury and undertake a de novo review of the record, we need not reach these assignments of error.
[6] FNBC contends that the trial court's refusal to give the charge was error and the Bank of LaPlace asserts that the trial court erred in refusing to instruct the jury on the absence of fiduciary duty owed under that statute. Similarly, FNBC contends that the trial judge gave inadequate, misleading, and prejudicial instructions pertaining to fiduciary duty under Louisiana law.
[7] La.Rev.Stat. 6:1124, Legislative intent; Acts 1991, No. 581, § 2.
[8] See Trans-Global Alloy Ltd. v. First Nat'l Bank of Jefferson Parish, 583 So.2d 443, 450 (La.1991); Lott v. Haley, 370 So.2d 521 (La.1979); Ardoin v. Hartford Accident & Indem., 360 So.2d 1331 (La. 1978) (Procedural and interpretive laws are not applied retroactively when such application would operate unconstitutionally to disturb vested rights or impair contracts).
[9] See also Bespress, Inc. v. Capital Bank of Delhi, 616 So.2d 795, 798 (La.App. 2nd Cir.1993).
[10] We note that the defendant banks objected only to the judge's adoption of the 8th Circuit's interpretation of Woodward. However, the creation of an independent cause of action for aiding and abetting is clear error and cannot be waived by the defendants's failure to raise the proper objection.
[11] Specifically excluded from the definition of a security is "any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance not exceeding nine months...." § 3(a)(10) of the Security Exchange Act, 15 U.S.C. § 78c(a)(10). It does not appear that post-dated checks falls within that definition.